UNITED STATES DISTRICT COURT

SUFFOLK, S.S                                    EASTERN MASSACHUSETTS DIVISION

---

BENJAMIN TARIRI,

Plaintiff

V.

DAVID KLUFT, Individually & Officially,

&

ANDREA CAMPBELL, Massachusetts Attorney General,

&

STEVEN TOMKINS,

&

SUFFOLK COUNTY SHERIFFS DEPT.

---

COMPLAINT

---

Respectfully, Benjamin Tariri, Pro Se Plaintiff, complains of the above-captioned

1

defendants,  for unlawfully confining him in absolute solitary confinement for 66 days, and while confined, forcing him to consent to disbarment without any due process in violation of the U.S. Constitution as well as Massachusetts Declaration of Rights.

JURISDICTION

This court has subject matter jurisdiction under 28 U.S. C. Section 1331.

VENUE

Venue is proper in Eastern Massachusetts Division.

PARTIES

1. Plaintiff resides in the State of Massachusetts.

2. Defendant David Kluft resides in the State of Massachusetts.

3. Defendants Andrea Campbell, the Massachusetts Attorney General, and Steven Tomkins, the head of Suffolk County Sheriffs Department have their principal offices in Boston, Massachusetts.

RELEVANT FACTS COMMON TO ALL COUNTS

4. Plaintiff repeats and realleges the above paragraphs as though more fully stated herein.

5. In the year 2020, Plaintiff had been a practicing lawyer in good standing in the state of Massachusetts for almost two decades.

6. At all relevant times, Plaintiff operated a very busy law office in downtown Boston, serving over one hundred active clients at any given time.

2

7. Plaintiff was known as a Community lawyer because he catered to clients across the cultural spectrum, many of whom could not have otherwise afforded legal representation.

8. Plaintiff was highly reputable and was well-known for his advocacy for his clients.

9. As a professionally qualified attorney, Plaintiff knew that he had to obtain positive results while charging them little , and sometimes no fee if the client could not afford it.

10. Plaintiff would make House calls if the client was elderly or ill. He would visit the clients' places of business to ensure they did not have to drive to downtown Boston.

11. Given Plaintiff's effective style of advocacy, coupled with his low fees, he did not need to advertise because his clients would  refer new clients to his office

12. On a personal level, Plaintiff had three children, and by 2020 was divorced. His youngest child, a 14-year old boy lived with him

13. As the result of the divorce, his youngest child had become sick and had been in and out of hospitals for at least 45 times. Plaintiff was always by his son's side, no matter the time of day or night. This was a nonstop process.

14.Plaintiff had been playing the Massachusetts Lottery off and on since 2012.

15. Over the years Massachusetts Lottery steadily encouraged the Plaintiff to play more by spending more of his funds on the Daily Numbers Game. Soon, Plaintiff had become addicted to Playing the Numbers game.

16. By 2020, Plaintiff was a daily player, spending large sums of his own money as well as borrowed money playing twice daily and also buying scratch tickets

17. At the same time, Plaintiff worked seven days a week while caring for his youngest son, as well as supporting his other two children who were a few years older by paying his ex wife for their expenses.

18. Plaintiff would also financially help his oldest son directly, almost on a bi-daily basis.

19.  In 2020, he met a prospective client by the name of Andrew Emerzian. At the time, Mr. Emerzian was the assistant manager of Dunkin Donuts (now known as Dunkins) branch in Fresh Pond, Cambridge, Massachusetts.

3

20. Mr. Emerzian, who seemed very distraught, explained to Plaintiff that he had literally lost all his life savings to Mass Lottery by playing and buying scratch tickets.

21. The scratch tickets were the same ones that Plaintiff had been buying in volume as well.

22. Plaintiff, who was quite familiar with Mass Lottery, and in fact had investigated it, namely the Numbers Game over the past few years, understood and empathized with Mr. Emerzian's plight. He also realized that he (Mr. Emerzian) too was an addict, and could not stop playing even if he wanted to.

23. Plaintiff decided to accept the representation of Mr. Emerzian. He knew that but for the actions of Mass Lottery, Mr. Emerzian, like countless others, who are susceptible to become addicts, would not lose their life savings, as he himself had done.

24. As he did further research, Plaintiff also discovered that Mass Lottery had been cheating on the scratch tickets as well.

25. At the time, for almost two years, Mass Lottery had been selling a scratch ticket named "200 X" for'$30 a ticket  The ticket advertised on top of its face "Win up to $15,000,000!" This was in color pink to gain more attention. It did.

26. Plaintiff himself had purchased thousands of these tickets himself. Mr. Emerzian stated that he had bought more than $43,000 in tickets.

27. Not surprisingly, neither Plaintiff nor Mr. Emerzian had won the Grand prize of $15,000,000.  But this was not the problem, as Plaintiff discovered. After all, every player knew that he or she was not guaranteed to win that jackpot.

28. What the Plaintiff found out was rather demonic on behalf of Mass Lottery: For the last 9 months of 2020, there was NO jackpot. The last one had been claimed in 2019. Yet, they kept on selling these tickets without letting the public know.

29. There was no sign at the stores or notice to the vendors to alert the unsuspecting customers not to buy these tickets. As the result,  Mass Lottery had received hundreds of millions of dollars during the 9 months that they sold the grand quack pots less tickets.

30. It was akin to a restaurant advertising "Steak for $20," and when the customer walks in, they take the $20 first and then say to the customer: " sorry we are out of steak, but your payment is nonrefundable!."  This was definitely fraud on a grand scale.

31. Plaintiff had previously investigated the Numbers Game of Mass Lottery and had discovered that they cheat there as well. He had even filmed the drawing to prove that point. He had solid proof.

32. Armed with ample admissible evidence, Plaintiff drafted a comprehensive complaint, comprising 142 paragraphs. See Emerzian v. Mass Lottery Comm'n No. 2184CV02493 (Suffolk Superior Ct.).

33. Prior to filing the Complaint,Plaintiff, realizing that it would help the case if another Boston attorney, who has been involved in well-known class actions against national conglomerate could act as co counsel, contacted  several popular Boston attorneys with whom he had personal or professional relationships.

34. He spoke with one veteran lawyer whose office is on State street, Boston.

35. That attorney asked Plaintiff to send him a copy of the complaint to review. Plaintiff did. He also sent one to another attorney who had filed a class action against Uber and had won or settled.

36. A month went by and he received a call from the first attorney, who said: " You know, it looks like you got something here." That was very promising to hear for Plaintiff.

37. But then he continued to state that he declined to be co counsel on the case.

38/ When the Plaintiff inquired as to the reason, the attorney stated: " Look, I live in this State. I work here. You're going up against the State's treasury, their purse. These people get paid  their salary from Lottery revenue. I don't want to have a target on my back. This is big money.. But good luck if you decide to go forward. "

39. Disappointed, yet encouraged at the same time, he called the Uber case lawyer. He essentially heard the same reasoning.

40. Nobody was going to fight the Mass Lottery because you would be fighting the State, he was being told.

41. Plaintiff decided to file the viable complaint anyway, which he did with Suffolk county Superior Court in downtown Boston.  He assumed it is just a lawsuit, what could go wrong?

42. About the same time that Plaintiff had been discussing the complaint, he received a complaint from Massachusetts Bar. It was about a discrepancy concerning a client's account.

43. Over the last two years, and especially during the Covid-19 period, Plaintiff had let his accounting lapse and he had essentially not updated his bank accounts as required by the Bar rules. So it was easy to see discrepancies.

44. Although some funds had not been properly accounted for, no money was taken.

45. In fact, the issue was not money missing, but the fact that the accounting was not properly done as required.

46. Plaintiff understood that he had to set the record straight. As he was doing that, his son , who was at home due to Covid-19 school closures needed him more than ever.

47. Caught between a busy workload, his son's full-time needs (Plaintiff did not have help at home), and the Bar complaint, which  Plaintiff took very seriously, and his Lottery addiction, which extracted all his funds, there was literally no time to think.

48. But Plaintiff knew that no money was taken. In fact, he had borrowed from several friends to ensure his clients were not hurt. None of the clients were complaining about money anyway.

49. The Bar then began to contact Plaintiffs clients, explicitly asking them if they wanted to file a complaint. Out of over 120 clients, only five were convinced to file. Even they, later admitted, did not want to file, but were given little choice.

50. At this time, as Plaintiff had learned later, there were several communications between the Bar and Mass Lottery. This is a fact, to which the Bar has already admitted, but has refused to provide the "7-8 emails," which the two had exchanged.

51. It must be noted that the purpose of this current complaint is not to accuse the Bar of anything-- Plaintiff is simply stating the facts as they were at the  time.

52.Later in 2021, Plaintiff was able to show that the first complaint had been paid off. But by then there were two new complaints, not by clients but by 3rd parties who were independently in communication with the Bar.

53. In 2022, the Mass Lottery case was going forward, and Plaintiff had just filed his voluminous opposition to the motion to dismiss filed by Massachusetts Attorney

General. Plaintiff was very confident that given the slew of evidence on his side, the complaint would not get dismissed. This complaint was the first of its kind in the U.S. A case of first impression.

54. However, in 2022, the Bar required Plaintiff to sit for a sworn interrogation, also called Statement Under Oath.

55. This process took three days, during which, Plaintiff, without the assistance of counsel responded to every question, truthfully and fully.

56. Plaintiff was never told, nor did he imagine that his statements would be used in a criminal setting. The setting was certainty custodial, but that is besides the point in this complaint. He was also,under the bar Rules, mandated to attend, or his license would be suspended. He had no choice but to attend.

57. As Plaintiff was preparing to appear for the hearing for the Mass Lottery case in superior court, he received a notice that his law license was about to get suspended by the Single Justice of the Supreme Judicial Court ("SJC"), the body, which handles bar disciplinary matters.

58. At about the time of the Mass Lottery hearing, Plaintiff appeared before the Single Justice on the Bar Counsel's petition.

59. Distraught and without an attorney, Plaintiff tried to explain that no one has been harmed and he would work on his accounting of his lawyer's bank account.

60. Plaintiff explained that he had numerous clients whom would be harmed if he could not represent them,that some of his clients were facing deportation, one had been in prison for 7 years and had hired him to get him released at a trial the next month. He said his clients could not afford to pay a new lawyer. That they trusted him and his judgement, not another lawyer. He talked about the Mass Lottery case, and how important it was for the people of the Commonwealth, who were being cheated of their hard- earned money.  He also offered that he would work for free until the accounting issues are resolved, and that he would not take any new clients in the interim.

61.  The honorable Judge, on  profusely urging of Bar Counsel, promptly suspended Plaintiff's law license in December of 2022.

62. By doing so, Plaintiff was effectively excised from the Mass Lottery case, and all his other legal cases.

63. The Single Justice also ordered that the Plaintiff write a letter to all his clients apprising them of the suspension, and mail it to their addresses via registered certified mail,return receipt requested.  He required Plaintiff to provide proof of the mailing of these letters by April 21,2023.

64. But by this time, the Bar Counsel had collected all plaintiff's clients physical files, as well as his office computers, leaving Plaintiff little or no outlet to locate his client s' addresses.

65. As Plaintiff stepped out of the suspension courtroom, he noticed a text on his cell phone. His youngest son was taken to the ER at Boston Children's Hospital. He drove straight to the hospital. By this time Plaintiff had remarried but nonetheless he devoted his full time to his son. This was particularly so since his law license was suspended and he could not help his clients in their cases.

66. His son stayed at the hospital for about two weeks, during which Plaintiff stayed with him too.

67. Plaintiff's passed away at home a month later. He was 17 years old.

68. Plaintiff's son's unfortunate death simply devastated Plaintiff. He had not missed a day in his life without wanting to be with him.  Plaintiffs grief turned into severe depression where it drove him further into his Lottery addiction.

69. A few weeks before the next hearing in April, the Bar Counsel referred the Plaintiff to lawyer so that it would appear that he is being represented.

70. The lawyer was an ailing elderly man who was virtually helpless, and given his inability even clueless as to the details of Plaintiff's case. In fact, they met only once before the hearing.

71. Before the hearing, Plaintiff had spent an inordinate amount of time tracking down clients' addresses without access to his files or computer. At this time he had upwards of 120 active clients. By the time of the hearing, Plaintiff had printed the letters and had the envelopes as well as the green mail slips with him. All he had to do was to write out the names and addresses on the envelopes and the slips. The order had also required him to send the letters by regular mail as well, which necessitated even more time and effort.

72. Plaintiff also did not have the funds, which was more than $600 to mail the envelopes. He had planned to borrow these expensed from yet another friend. He planned to ask the court for a 2-day extension.

73. As soon as Plaintiff entered the courtroom, he realized there were several court guards, bailiffs in the courtroom. Based on his legal experience, these guards are only in the courtroom if a person is to be apprehended.

74. As soon as the honorable justice took the bench, the Bar counsel blurted out alluding that the Plaintiff had not complied with the Judge's order.

75. With all the letters and enveloped in hand, Plaintiff rose to say that was not true, and that he needed an extension of two days. But the judge motioned to him to sit down and asked the ailing attorney, whether Plaintiff had complied with his order. The man simply said :"No."  Plaintiff was not allowed to speak.

76. The  judge saintly said: "90 days. Take him into custody "

77. As the Plaintiff tried to point to the pile of papers and envelopes in his hand and on the table, he was quickly handcuffed and led away.


SOLITARY CONFINEMENT


78. Plaintiff was not even  given a chance to call his wife and his sons. Even his car was just left on the street

79.Plaintiff was not just handcuffed. He was also shackled and they even connected a third  chain which wrapped around his waist and  locked on to his hands and feet.

80. Plaintiff was then pushed into a police paddy wagon and driven away.

81. Within half an hour, by late afternoon, plaintiff was dragged into an old building where he was taken to an upper floor. He was then pushed into a small dark room and they shut the metal door. And they left.

82.  Plaintiff looked around. There was nothing in the cold concrete room, not even a bed. There was a concrete slab upon which Plaintiff sat.

83. About 3 hours later, the metal door clanked open and someone threw an an old plastic cot, with large vertical cuts across it, along with two white sheets and a thin blanket. The door then shut.

84. No one ever came to check on him or tell him anything. He was simply left there to his own devices.

85/ It was still early spring in Boston and the weather was in mid thirties . The cold breeze seeping into the cell made the cold room even colder.

86. As the Plaintiff learned later, this was the so-called "Hole" that he had heard about. The Hole is the place in the correctional facility where they would send violent prisoner in order to punish them. But Plaintiff had not done anything to deserve this punishment.

87. Plaintiff was forced to stay in the small cold cell 23 hours out of 24 hours a day. Even then, for that one hour ,he was required to walk around in handcuffs.

88. There was no one to talk to. There was not even a mirror or nail clipper, or a way to shave or cut his hair.

89. After a few days in that condition, he asked the guards, who were not even supposed to converse with him whether his sons of his wife can visit him. They said plaintiff can ask the warden in writing.

90. Plaintiff was not even given a piece of paper. But after a week the succeeded in obtaining several sheets of paper and even a form to request visitation.

91. The Defendant denied Plaintiff's request  from his children or wife, and wrote: "No Visits." A copy of this document is attached and marked as Exhibit "A."

91. Plaintiff was held in solitary confinement for 66 days without a court hearing on the legality of such cruel and unusual punishment.

92. During this period, Plaintiff's mental status quickly began to deteriorate. This was especially so because he was still grieving his son's death whose dead body he had embraced in his home. The pressure in that small solitary cell was simply unbearable.

Disbarment.

93. During his solitary confinement, being again unrepresented, he was able to speak with Bar counsel several times during his 1-hour breaks out of his cell.

94. Dazed and confused, Plaintiff just wanted to break free from the obvious torture.

95. Plaintiff asked the Bar counsel what he needed to do to get out. He suggested that he consented to disbarment.

96. This was very difficult for Plaintiff to accept . He did not believe he did something deserving of this barbaric treatment. But at the same time, he also wanted to help his clients.

97. He asked the Bar Counsel what would happen if he did not consent to disbarment, to which he responded: "Then you will stay there for a looong time."

98. Plaintiff never understood how he was supposed to comply  with the Court's order by sitting in a cold and bare  concrete room without any means to comply.

98. Not having any other options, and without any hearing, nor an opportunity to be heard, he told the Bar counsel to go ahead with disbarment. He never heard from the court or anyone else.

99. Plaintiff was released on June 26, 2023, 66 days after he was confined, precisely the same day that the Court ordered his disbarment.

100. To Plaintiff, coming out of the solitary confinement felt like being freed from a hostage situation. Seeing his son and wife was truly surreal.

COUNT 1

GROSS NEGLIGENCE

102. Plaintiff repeats and realleges the above paragraphs as though more fully stated herein.

103.On or about April 21,3023, the Defendants, each in their individually and professionally,  singly and collectively caused to harm the Plaintiff by assailing him, confining him, and depriving him of the most basic human needs.

104. At all relevant times, the Defendants had the opportunity to stop their abusive conduct against the Plaintiff.

11

105. Defendants, acting individually, and in concert with each other, harmed the plaintiff by failing to recognize his basic needs as a human being.

106. Defendants are jointly and severally liable for all injuries and  damages caused by them.


COUNT 2

NEGLIGENCE  (Under the Massachusetts Torts Claims Act, MGLC 258)


107.Plaintiff repeats and realleges the above paragraphs as though more fully stated herein.

108. Defendant Mici , as the commissioner of the Department of Corrections, had a duty of care towards the individuals who enter the facilities under her supervision and control.

109. Defendant Mici breached her duty of care when she placed the Plaintiff in solitary confinement, an area which was earmarked  as a special and specific punishment for specific egregious criminal conduct.

110. Defendants, jointly and severally failed to protect the Plaintiff from being placed in solitary confinement, despite their knowledge that he did not meet the requirements  to be placed in such a setting.

111. Defendants, jointly and severally acted negligently and are liable for the harm suffered by the Plaintiff as the result of their actions.


COUNT 3

VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C.S. Section 1983


112.Plaintiff repeats and realleges the above paragraphs as though more fully stated herein.

113. At all times relevant, the Defendants acted under the color of Massachusetts laws when they interacted with the Plaintiff

114. From April 21, 2023 to June 26, 2023, Defendants individually and collectively deprived the Plaintiff of his basic civil right to live and be treated liker a normal human being.

115. The Defendants deprived Plaintiff of freedom to walk, eat,sleep, and even deprived him of his right to visit with his wife and his son.

116. Defendants, during the relevant period, ensured to absolutely separate him from others thus depriving him from seeking legal  counsel.

117. Defendants' actions caused severe irreparable harm to Plaintiff.


COUNT 4

VIOLATION OF 8th Amendment of U S. Constitution


118. Plaintiff repeats and realleges the above paragraphs as though more fully stated herein.

119. Plaintiff was placed  by Defendants in solitary confinement for 66  days. There was no hearing on the fact that the confinement would be solitary.

119. The Eighth Amendment of U.S. Constitution, "guarantees individuals the right not to be subjected to excessive sanctions." Miller v. Alabama, 567 U.S. 460,461 (2012). " That right " flows from the basic percept of justice that punishment for crime should be graduated and proportioned to both the offender and the offense. Id.

120. In Plaintiff's case, no crime was committed. In fact, this was supposed to be a civil commitment, as the Defendant has acknowledged in Exhibit A.

121. Even in criminal cases, the United States Supreme Court has held that a hearing is required for solitary detention beyond 10 days.

122.By subjecting the Plaintiff to the harsh solitary imprisonment, the Defendants violated Plaintiff's 8th Amendment right to be free from cruel and unusual punishment.

13

COUNT 5

Violation of Massachusetts Declaration of Rights, Articles 11,12,, 26

123.Plaintiff repeats and realleges the above paragraphs as though more fully stated herein.

124. On or about April 21,2023, Defendants, without affording the Plaintiff an opportunity to explain or defend himself literally abducted him and held him in solitary confinement until he agreed to disbarment.

125. Defendants, in concert with each other, physically  and forcefully transported the Plaintiff to a single room within the City of Boston.

126/ While there, in absolute solitary confinement, without counsel, and under tremendous psychological pressure, they coerced and forced the Plaintiff to consent to disbarment.

127.  Defendant Kluft pointedly and explicitly  threatened the Plaintiff that if he did not agree to disbarment, he would remain in solitary confinement for a long time.


COUNT 6

VIOLATION OF THE 14TH AMENDMENT OF U.S. CONSTITUTION

128. Plaintiff repeats and realleges the above paragraphs as though more fully stated herein.

129. By unlawfully placing the Plaintiff in solitary confinement for 66 days without a hearing, the Defendants deprived the Plaintiff's of his right to his liberty.

130. By unlawfully forcing the Plaintiff to consent to disbarment without hearing, Defendants deprived him of his right to his property, which was his law license.

131. By depriving the Plaintiff of his rights to liberty and property without even a semblance of due process, the Defendants violated Plaintiff's 14th Amendment rights under the U S. Constitution.

COUNT 7

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

132. Plaintiff repeats and realleges the above paragraphs as though more fully stated herein.

133. The Defendants' conduct by forcefully placing the Plaintiff in harsh solitary confinement for 66 dayd, and then extracting a concession in the form of consent to disbarment without a counsel or any due process was intentional.

134. The Defendants' conduct was extreme and outrageous.

135. The Defendants' conduct was clearly reckless.

136. The Defendants' conduct was beyond all bounds of decency, to be regarded as atrocious, and utterly intolerable in a civilized community.

137. The Defendants' conduct has resulted in severe emotional damage with long-term life time ramifications, as well as irreversible and irreparable reputational damage.

COUNT 8

RESPONDEAT SUPERIOR ('Supervisory Liability)

138. Plaintiff repeats and realleges the above paragraphs as though more filly stated herein.

139. Defendants controlled and supervised the activities of the employees at the establishment where the Defendant was held in solitary confinement.

140. Defendants were fully aware of the day-to-day operations of the establishment.

141. Defendants were fully aware that the Plaintiff was being held in solitary confinement for 66 days in  dire and harsh conditions.

142. As supervisor (s),' Defendants are jointly and severally liable for the actions of their employees

COUNT 9

INTERFERENCE WITH BUSINESS RELATIONS (Defendant Kluft)

143. Plaintiff repeats and realleges the above paragraphs as though more filly stated herein.

144. At all relevant times, Defendant Kluft was well aware that Plaintiff was operating a professional corporation.

145. Said professional corporation was called Tariri Law Offices, P.C., and was duly registered under the laws of Massachusetts.

146. The Corporation had at all times relevant at least 120 law clients.

147. Plaintiff's clients included many immigrants as well as others whose cases concerned real estate, contract's, asylum, criminal, as well as other areas law.

146. Defendant Kluft knew that Plaintiff's client relied on his help to resolve their legal issues.

147. Defendant Kluft was aware that these clients' cased were time sensitive and any delay could cause irreparable damage to the client as well as to the Plaintiff.

148. On numerous occasions, Defendant Kluft contacted Plaintiff's clients despite the fact  that they were not the subject of or in involved in any investigation.

149. On these occasions, Defendant Kluft made derogatory remarks about the Plaintiff, and also encouraged them without basis to file complaints against the plaintiff, which they declined to do so.

150. From the inception of his involvement, Defendant Kluft was fully aware and well versed about Plaintiff's civil complaint against Massachusetts Lottery.

16

151. According to the Defendant's own affiliated department, Defendant Kluft had been in communication with Massachusetts Lottery about the Plaintiff.

152. By interfering with Plaintiff's law practice and unsolicitedly contacting his clients, and ultimately succeeding in suspending and then disbarring the Plaintiff, he has directly interfered and caused irreversible harm to Plaintiff and Plaintiff's clients, resulting in massive financial damage.

153. Defendant Kluft is individually and professionally liable for all damages caused by him, including, but not limited to, prospective damages in the Mass Lottery matter.

PRAYERS FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgement against the Defendants as follows:

A. Declaratory relief pursuant to the above-cited Statutes;

B. Compensate Defendant for his actual, incidental, consequential damages;

C. Order injunctive relief from the disbarment;

D. Pay Plaintiff's legal costs for this action, including, but not limited to, Plaintiff's attorney fees, prejudgement interest, and costs; and

E. Any other relief that this Honorable Court deems just and proper.

PLAINTIFF HEREBY RESPECTFULLY REQUESTS A TRIAL BY JURY ON ALL

MATTERS SO TRIABLE.

17

DATED: June 10, 2026

Respectfully submitted,

Benjamin Tariri, Pro Se Plaintiff

18